Case No. 17-1135NL. The Town of Weymouth, MA, petitioner for the Federal Energy Regulatory Commission. Ms. Barrett for the petitioner for the Town of Weymouth, MA. Ms. Elephant for the petitioner for the Federal Energy Regulatory Commission. Ms. Barrett for the respondent. Ms. Marlowe for the intervener. Mr. Brewer, before you start, you've taken five minutes and co-counsel five minutes. How have you divided, or have you divided the time by subjects? We have divided the time by subjects, yes, Your Honor, and I'll be concentrating this morning on the question of first impression, which is whether the Federal Energy Regulatory Commission can issue a Certificate of Public Convenience and Necessity under the Natural Gas Act before the State has had an opportunity to issue its consistency determination under the Coastal Zone Management Act. It is the petitioner's position that in fact the Federal Energy Regulatory Commission cannot issue a conditional CPCM under the Natural Gas Act when the project is going to be affecting coastal lands and the State has not yet had its opportunity to issue its consistency determination under the CZMA. The Natural Gas Act expressly preserves the CZMA from preemption for projects that affect coastal lands. The Coastal Zone Management Act preserves the rights of States to review and approve such projects before any Federal license or permit that affects the coastal lands can be granted. I submit to Your Honors that your recent Delaware Riverkeeper case actually supports the Town of Weymouth's position that this conditional CPCM should not have been granted before the Commonwealth of Massachusetts had an opportunity to issue its consistency determination. The reason I say that is because... Can I ask a quick fact question? Have they issued it yet? I'm sorry? Have they issued it yet? They have not, Your Honor. How long does that process usually take? Well, it is supposed to have been done by now, but the applicant and the State have extended it by agreement in part because the State said, if you don't agree with this, we are not going to issue you a consistency determination. The applicant being the construction company here? Exactly. Yes, Algonquin. How long is it normally supposed to take? Six months, I believe. Okay. Thank you. So, Your Honor, if I may, under Massachusetts' federally approved Coastal Zone Management Program, among its enforceable policies are compliance with Mass. General Laws, Chapter 91, the Public Waterways Act, and... You're going to explain why it's different than Delaware, where we held that a conditional certificate is okay? Yes, Your Honor. I'm sorry, yes. That is because of the focus, as this Court focused specifically on the Clean Water Act language, which said that a federal licensure permit that does not result in a discharge into navigable waters could be issued before the water quality certificate was issued under the Clean Water Act. Here, this conditional CPCM does affect the coastal lands, and as such, it is contrary to the express language of the statute. How does it affect the coastal lands of Massachusetts? So, what it has done is, as soon as the conditional CPCM was granted, it truncated how the Commonwealth of Massachusetts could apply its enforceable policies in the course of determining whether it should issue a consistency determination. How did it truncate? That is because of the way that the Massachusetts Coastal Zone Management Program works. As I was starting to say, it has enforceable policies. Those enforceable policies have to be met in order to get a consistency determination under the CZMA. The enforceable policies of Massachusetts include the statutes of Chapter 91 and Chapter 131, Section 40, the Public Waterways Act and the Wetlands Protection Act. Chapter 91 of the Commonwealth of Massachusetts General Laws specifically states that the applicant who has certified that they are in compliance have to comply with local zoning. What happened as soon as this conditional CPCM was granted, Algonquin went to the District of Massachusetts for both this and for the Wetlands Protection Act and said, you the State can no longer look at all of the requirements of your enforceable policies because they are preempted because of the issuance of a conditional CPCM, which would not be the case. Based on what? I mean, where did they get the idea they could do that? Well, in fact, they have gotten a judgment from Judge Denise Casper in the District of Massachusetts that in fact they can do that. That doesn't answer my question. What is there about either the conditional certificate or the power of this federal agency that authorized cutting off the Massachusetts procedures? They have said that, as Judge Casper agreed with them, that it is due to the preemptive effect of the Natural Gas Act. But it doesn't preempt the coastal zone. So maybe the District Court of Massachusetts is wrong, but that doesn't answer the question for us. In fact, I assume your argument is that the District Court of Massachusetts is wrong. It is, and in fact the First Circuit is going to be hearing that argument in January. All right, so we are obviously not bound by the District Court. Our question is, is there anything in the certificate that makes it different than the certificate in the Delaware case that we upheld? It doesn't say it is preemptive. It doesn't say anything else. Well, we know about the preemptive effect of the Natural Gas Act. What I say is that the Coastal Zone Management Act specifically says if the CPCN affects coastal lands, it needs to wait until after the consistency determination is granted by the State of Massachusetts. And I see my time is up, Your Honors. Can I ask a quick question? Yes, sure. Has there been any eminent domain proceedings under FERC's certificate order in Massachusetts? No, there are none, but of course this Court's decision will have broader implications. And so I would argue that indeed, while it isn't in this case, an eminent domain power being granted by the CPM certainly would affect coastal lands. Thank you, Your Honors. Good morning, Your Honors. I would like to highlight three points related to the brief. The first is that FERC violated the Natural Gas Act by failing to evaluate whether Algonquin could realistically comply with the FINSA regulations on safety. The second point is that FERC violated NEPA and the CEQ regulations when it failed to assess the impact of project emissions on climate change, and also, more importantly, on Massachusetts' ability to comply with its own aggressive climate change goals. And the third point, if I can get to it, is that the certificate order was made final by operation of law because the tolling order was invalid. I'll begin with the safety issue. The issue that we have there primarily is that FERC requires the applicant to certify that it can comply with safety regulations, which is a really unremarkable certification because... And they made that certification, didn't they? Yes, Your Honor, they did. So why doesn't that just end it? Our issue is that FERC didn't evaluate how realistic it was for Algonquin to be able to comply, and that's a point that's really hit home in the intervener's brief at page two to five, and we cited this also. There's a regulation that talks about how if a compressor station is on a property adjacent to another structure, it has to be located in a place far away enough so that there's no risk of fire being communicated to the compressor station. Here, there's only a tenth of a mile, which is about 500 feet, between two structures, and it's inconceivable as to how... How is this Court supposed to evaluate that? That's not anything we know anything about. No, Your Honor, but FERC, it is something, this Court can ask FERC to evaluate how realistic it is. When the interveners raised this argument about the close proximity, FERC simply said in the recurring order at Joint Appendix 2981, it just responded with this mantra with respect to the argument that the applicants never analyzed the effect of an incident compensation. Did the interveners file a petition for review? They filed a petition, and the coalition also made these arguments, Your Honor. Oh, all right. Yes, I just... So I don't have to look at the intervener's brief? They had gotten... I felt that they amplified the issue in addition to the way we had framed it, but we both made the argument. But essentially, FERC's response is that PHMSA is the agency charged with developing the regulations that apply to this case, and so FERC's got to do a little bit more. And I think I gave the analogy in our reply brief that if you've got a kid who hasn't done their homework, and they say, Mom, I want to go on a camping trip. I'll finish it when I come back, and they're going to come back, and I'll have like a half hour to do it. You're not going to let your kid go, because you know that that's not a realistic promise. Here, FERC has to at least assess the factors surrounding the safety issue to determine how realistic it is for alcohol crimes to be able to comply with PHMSA. I'll next move on to the... FERC, in this instance, and I would like to make a correction in our brief for something that wasn't clear in our brief. In this case, FERC is required to look at the indirect impacts of a project, including air quality emissions and the impact on climate change. FERC actually, in the certificate order, did in fact quantify the GHG emissions from upstream activity. However, what it didn't do here with respect to climate change is talk about what the impact was going to be. It just made a very conclusory statement that this was going to have no significant impact. So that's our first argument. Why isn't that a statement? It made a statement. There's no evidence on which to base it. It didn't attempt to... But it stated how much would be added in greenhouse gas emissions, right? And how that compared to what there were before in the region. What else? Do you make an argument that they should have done... I didn't see an argument that they should have done something else. No. We had said that that part was inadequate. The second part of the argument that I think is better discussed more comprehensively in our brief is that FERC really didn't look at how those impacts would affect Massachusetts' ability to comply with its very aggressive climate change... Well, I thought their argument there is that Massachusetts' program specifically urges more natural gas to replace coal, I guess, or oil. So the program that the EA looked at was not something that was necessarily related to climate change. That was just an energy plan, and the energy plan endorsed the use of natural gas. However, there's a statute that we cited, the Massachusetts Global Warming Statute, that requires the state to attempt to reduce emissions by 25% by 2020 and 80% by 2050. So here you have not just this one 7,700 horsepower compressor stationed in Weymouth, but you've also got upgrades to a total tune of 31,000 horsepower and the associated emissions. And there was no analysis of what the impact would be on Massachusetts' ability to comply with its greenhouse gas goals, to reduce those goals. And this is an issue, if I could just add, states are very concerned about this. If this court could take notice in another case, Otsego 2000 v. FERC, it's docket 18-1811, where the state, six states filed an amicus brief urging this court to hold FERC to its obligation to review the impacts of projects on climate change because the states are hamstrung. They don't have any control over interstate gas regulation, and if the interstate projects are going to contribute to climate change, that could very well block the states from achieving their goals. So at the very least, the EA does not even acknowledge the 20% reduction that Massachusetts is required to make. And the page in the EA that I'm referencing, this would be the EA 2-143 Joint Appendix 1349. That was the sole paragraph that I was able to find in the record up until the rehearing order where FERC addressed or where there was any discussion of anything remotely related to climate change. I see that my time has also expired. Are there questions from the bench? No. Okay, thank you. May it please the Court, Lona Perry for the Commission. The conditional certificate order that the Commission issued is exactly the same kind of conditional certificate order that was issued in the Delaware Riverkeeper case that this Court affirmed. There is nothing in the conditional certificate order that would affect any land or water use or natural resource of the coastal zone within the meaning of the Coastal Zone Management Act. And therefore, there was nothing precluding the Commission from issuing the conditional certificate in anticipation of the Coastal Zone Management Act clearance being granted later on. You referenced a district court ruling that treated the FERC decision as preemptive of some aspects of the coastal zone. If that's what a district court had held, would that be wrong? Your Honor, with regard to preemption, as this Court found in its Myersville decision, all that the Coastal Zone Management Act, or there they were talking about the Clean Air Act, but they also cited Coastal Zone Management Act cases, all that that protects is what is included in the state plan. And if anything in the state plan is not preempted by the Commission orders, and anything that is not in the state plan is not protected by the Coastal Zone Management Act. If a district court decision were to hold otherwise, FERC would not agree? With their reading of the statute? My understanding is that anything that has been held to be preempted is not part of the Coastal Zone Management Plan, that it is local zoning laws. And if it were held to be preempted? It would be preempted, yes, Your Honor. I mean, it's protected under the statute. Would not be preempted? Yes, that's right, Your Honor. If it's part of the state implementation plan, it would not be preempted. If it's another local zoning or ordinance or wetlands provision that is not part of the state implementation plan, then it can be preempted by Commission action. I mean, the Commission's order made no findings about what is or is not preempted as far as Massachusetts law goes, but that would be the way preemption would work. It's only protected if it's part of the state implementation plan. But you argue in your brief that in this case the town's wetlands ordinances are not part of the state's coastal plan, right? Am I right about that? Well, Your Honor, I think what I was saying is if they're not part of the state implementation plan, then they're not protected. Well, isn't that what you say in your brief, that they're not, in fact, protected? Well, because what the petitioner was arguing is that by virtue of the certificate order, there are other provisions of law under Massachusetts that would apply, but for the certificate order. They weren't talking about the state implementation plan. They were talking about other Massachusetts laws that they say would apply in the absence of the certificate order. But the point is if it's not part of the state implementation plan, and the presumption of their argument was that it's not, then it is not protected from preemption by the savings clause in the Natural Gas Act. And with regard to eminent domain, it is the case that there was no eminent domain exercise here for the only project. In Massachusetts? The only thing that's in the coastal zone, Your Honor, in this entire project is the Weymouth Station. None of the rest of the project is in any coastal zone, so there's no CZMA issue with regard to that. In the Weymouth Station, there was no exercise of eminent domain to acquire it, and in any event, the petitioners haven't explained how just the exercise initiating an eminent domain proceeding would interfere with the state coastal zone management plan. What part of the coastal zone management plan would actually prevent such a thing. But it's not an issue here because there wasn't any exercise of eminent domain here. Can I ask you a question about the Natural Gas Act claims here? And in particular, the Commission said part of the reason that granting the certificate, in its view, was consistent with public convenience and necessity was to meet the demand for power in New England. That's right, Your Honor. And as it turns out, slightly more than half of this is slated to go to Canada. How does that analysis work? Well, the analysis works, Your Honor, because the project facilities that issue here were all designed to enhance the capacity on the Algonquin Main Line, which runs from New Jersey to Massachusetts. And there are no facilities on the Maritimes Line going from Massachusetts all the way up into Canada, except for one metering station, but it didn't increase any extra capacity. This is all capacity that's designed to improve service on the Algonquin Main Line, which is for the purpose of... I'm sorry. But it's for the purpose of enhancing service in the... Did they say enhancing service? I thought they said meeting the need, meeting demand in New England. Well, if you look at the rehearing order at 118, the Commission also said it was to reduce constrictions, constraints on transportation on the Algonquin Main Line. And it adds capacity by reducing constraints on the main line, which permits them to serve demand in New England. And the Commission recognized that some of this gas was likely going to be delivered to Canada. Well, more than half here, so this is... Yeah. Well, Your Honor, actually, the Commission says 46% of the gas here is going to be delivered to... This is the certificate order at paragraph 121, 2487, that 46% of the project gas is going to be delivered to Maritimes. But this is delivered to Maritimes in Massachusetts. That doesn't mean all of it is going to Canada. Some of it will go to Canada, but Maritimes also has delivery points. I thought the 50% number somewhere, is that just a wrong number? Well, no, Your Honor, that was the petitioner's number. And the Commission said... Okay, so we're close to half either way. Well, right, Your Honor, but I'm just saying the 52% wasn't the Commission's number. Did I misunderstand? I thought your argument was that exports of gas to a country that's part of a free trade agreement are, by definition, in the public interest. Yes, Your Honor, that is true. So is that why we don't even have to worry about this? You don't have to be concerned that there isn't a demonstrated market need for this project because some of the project gas is going to go into Canada because the exports are already operating under a 2009 presidential permit where the Department of Energy found it to be in the public interest. Because Canada is part of a free trade agreement, right? Yes, Your Honor. Well, suppose the President pulls the country out of NAFTA. What happens then? Well, Your Honor, the point the Commission... He said last week that's what he's going to do. The point the Commission was making with regard to exports is... No, no, what about my question about NAFTA? Suppose there's no NAFTA next year. Suppose we're no longer part of NAFTA. Well, at that point, Your Honor, this is where the Department of Energy makes the determination about whether an export is or is not in the public interest. And if the Department of Energy, who is charged with making that determination, determines a particular export to be in the public interest, it's not the Commission's position or role to dispute that determination, essentially. And where did they make the specific finding that exporting nearly half of this to Canada is in the public interest in this case? The Department of Energy, Your Honor? No, no, no, no. The public interest under 717. Where did they make... They decided that this certificate order was justified for public convenience and necessity. That's right. And as I had read it, it was the public convenience and necessity they cited was serving the needs of New England, demand in New England. And then, as it turns out, half of it's going to Canada. So I may have just not read carefully enough, can you just point me to where the Commission found that public convenience and necessity were served by creating this gas for Canada? Your Honor, under the Certificate Policy Statement, the basic determination of whether there's a public benefit to a project comes from the fact that the project is fully subscribed by shippers, that there is a market need for the project. That principle would be true if 100% of this were leaving the United States? Well, the Commission said that it didn't matter that the demand was either foreign or domestic for purposes of determining the market need for the project, particularly in circumstances... Then why did they say this was to meet a need in New England? Because it did address constraints in New England. Your Honor, if 1% were going to New England, would it be sufficient to justify the decision to say this is meeting a need in New England and just not be explicit about a public convenience and necessity of doing all these changes in Weymouth to get gas to Canada? Those decisions could well be made. I'm just asking, doesn't the Commission have to make that hard decision and be upfront about what it's deciding? A couple of things about that, Your Honor. In the first place, the Commission specifically addressed this point about... They made arguments about the fact that this was going to Canada, and the Commission specifically addressed the issue about the fact that some of these precedent agreements contemplated that some of this gas was going to go to Canada. But when you're talking about in New England, it's not that there was any error in the Commission's statement that it was addressing demand in New England. On Algonquin, there was a... When addressing this, maybe you point me to the right place in the decision where in response to these concerns, because I'm afraid I read the decision maybe a little bit differently than you did.  That's in the public... That's consistent with public convenience and necessity, free trade zone, or for whatever reason they might choose. Did I just miss that in the decision? Well, Your Honor, the basic finding was that the precedent agreements demonstrate market demand for the project, and that means that it's in the... Market demand where? Market demand for the project in both New England, but there is also some Canadian deliveries. Both New England and Canada? Yes. The Commission said that this was meeting market demand in Canada. Two? Yes, Your Honor. It said, if you look at re-hearing, paragraph 39 of the re-hearing order, 2937, the Commission answered the arguments about the fact that some of it was going to go to Canada. And the Commission said that that didn't change the conclusion that there was market demand for the project. It was served market demand. No, they just say... That's the problem there. They're not saying that this project is... That these contracts are... That we're finding that this is necessary to meet demand either in New England or Canada. They say elsewhere it's about New England,  but go talk to the Department of Commerce about getting an export license. But if really... What I'm trying to figure out is if there... Imagine a hypothetical where New England didn't need it. Maybe it would take 1%, but they don't really need it. But 99% is going to go to China, or just to pick ex-foreign countries, so I'm not naming anybody, all right? Ex-foreign country. Can the Commission say we find public convenience a necessity because this will meet demand in New England when only 1% of it's doing that and 99% of it's going to country X? Well, it wouldn't much be the case in that circumstance, Your Honor, that it would be meeting demand in New England. Less than half is their position, or half may be in your position. I'm just asking why... They could or couldn't make such a finding, but they didn't seem to do so here. And I'm wondering for reason, decision-making, and transparency purposes why they didn't just deal with that. Why didn't they just discuss the legitimacy of sending a determination that need in Canada supports this project? Don't the people in Womack get you on that? I believe that they did, Your Honor. If you look at not only the rehearing order at paragraph 39, but also note 86 there, they also talk about the role of the Department of Energy, and they also cite to their Valley Crossing decision. And in that Valley Crossing decision, the Commission explains that free trade exports to free trade countries promote the public interest by decreasing trade barriers and increasing the flow of goods and services. And... I'm sorry, where is that in this? It's in note 86. Was it in your joint appendix at 2938? Mm-hmm. It's the Valley Crossing decision that the Commission cites. And the Valley Crossing decision explains why, in the Commission's view, the public interest is served by free trade exports.  to export to Canada. Absolutely, Your Honor. Section 3 of the Natural Gas Act says that the Department of Energy is required to find exports to free trade countries to be in the public interest. But the Valley Crossing decision was just explaining the Commission's view of why that is the case. But the Natural Gas Act... Why that is the case is that Congress of the United States said so. I don't think the agency has any more to say on that question. Right, right, Your Honor. That's absolutely right. The Natural Gas Act... This is to meet some need in New England. And it's also to send it to a country and then explain that. They just didn't do that here. I just don't understand why they didn't just say what was going on. But again, Your Honor, again, Your Honor, the focus on New England was because that's where the project facilities were going to be. There isn't anything... There's nothing from Massachusetts on that is a project facility that's enhancing anything having to do with the exports. It's all project facilities. And Algonquin has precedent agreements for that capacity on its main line in Connecticut and in Massachusetts. They're making deliveries there. It is serving demands in New England. There's nothing wrong with the Commission's statement to that effect. All right. We're eight minutes over here. Is there anybody else on the panel? Any other questions? Okay, thank you. We'll hear from the intervener. Good morning, Your Honor. Jeremy Marwell for Respondent Interveners Algonquin and Maritimes. If I could start with need and then touch on the Coastal Zone Management Act. This Court has repeatedly upheld determinations of need that are based on contracts for the transportation service in cases like Myersville, Minisink, and Sierra Club v. FERC. And if I could clarify, these are contracts for capacity, so contracts for transporting gas. They're not contracts for gas. Pipeline doesn't own the gas. And 100% of these contracts are for transporting gas on pipeline facilities in the United States. I think that may help respond somewhat to the idea that some of the gas is going to go to Canada. And the way the contracts work, which were filed- So Canada is not relevant? I don't think Canada is relevant under this Court's cases that do not look behind the market evidence of demand as shown by contracts. None of the capacity will be used to deliver gas to Canada? No, so I wouldn't go so far. The precedent agreements, there are a number of precedent agreements with different shippers, a range of shippers. Some shippers have delivery points on the Algonquin system, which is 100% in the United States. Some of the gas is going on to the Maritime system in Massachusetts. There are delivery points in New Hampshire and Maine. And some of the contracts have delivery points at the Canadian border. But shippers are purchasing what's called firm capacity, which gives them the right to ship. They don't always use that firm capacity. They may not always deliver to the same delivery point depending on what the market need is. But, so I think under the Court's cases, and especially in light of the- You were all told to FERC at the time? Yes, the precedent agreements are filed as part of the application. So they're part of the record. The agreements are, but they were explicit that some percentage of this is going to the Canadian border? I believe the precedent agreements indicate the range of potential delivery points and some of the contracts allowed the shipper to go all the way to the Canadian border. So that's correct. But none of them are for transportation in Canada. And that's in the public interest because of- Because of the statute. Because of the statute, right? Yeah, yes. Okay, all right. If I could briefly touch on the Coastal Zone Management Act and maybe correct the record. The Massachusetts Coastal Zone Management authorities have not rejected the application. It is ongoing. Algonquin has agreed to extensions of time because as part of the process, Algonquin is obtaining certain state permits that are part of the federally protected Coastal Zone Management program. Those permits have been granted by the state regulators to Algonquin but have been appealed and we have to work through the state appeals process. But the certificate did not affect- did not cut off anything about the Massachusetts Coastal Zone Management proceedings. The preemption case involved state laws that were not part of the federally approved program and therefore preempted. Is there any other questions? No. Thank you. Is there any time left? Do we have a minute? We'll give you another- Are you each taking? We'll give you another minute. No, you're on. You don't want- I didn't say. Great. All right, we'll take the matter under submission. Thank you very much.
judges: Garland, Tatel, Millett